IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN T. MARGO, Administrator of :
the Estate of James Michael :
Margo, Deceased, :
           Plaintiffs :
       v. : Case No. 3:04-cv-147-KAP-KRG
BEDFORD COUNTY; PRIMECARE :
MEDICAL, INC., FRANCIS LEGATH, :
P.A., CONNIE L. SOWERS, R.N.; :
and DEPUTY WARDEN ERIC D. EASTON,:
         Defendants :

## **Report and Recommendation**

Recommendation

       On June 27, 2002, James Margo, having recently injected himself with heroin, was committed to the Bedford County Prison. Margo died there eight days later due to conditions related to his withdrawal from heroin. Plaintiff John Margo (Margo's father and the administrator of Margo's estate) filed a complaint alleging that defendants were deliberately indifferent to Margo's serious medical needs[1]. Plaintiff also alleged pendent state law claims that some of the defendants were negligent in the medical care provided at the prison. Discovery has been completed and the defendants move for summary judgment on the federal claims. Pending are defendants Bedford County and Deputy Warden Easton's

---

1. Technically, the cause of action arises under the Due Process Clause of the Fourteenth Amendment because it appears Margo was a detainee not a sentenced parole violator, but because the relevant legal issues are identical to those developed in applying the Eighth Amendment, see Sylvester v. City of Newark, 120 Fed.Appx. 419 (3d Cir.2005)(affirming grant of summary judgment in prison death of detainee suffering from heroin withdrawal), the Fourteenth Amendment need not be separately distinguished here. I refer to the allegations of deliberate indifference as plaintiff's Eighth Amendment claim.

motion for summary judgment, docket no. 73, defendant Francis Legath's motion for summary judgment as to the Eighth Amendment claim, docket no. 76, defendant PrimeCare Medical's motion for summary judgment as to the Eighth Amendment claim, docket no. 80, and defendant Connie Sowers' motion for summary judgment as to the Eighth Amendment claim, docket no. 82. I recommend that the defendants' motions be granted in part and denied in part, and summary judgment entered in favor of Bedford County, and in favor of PrimeCare Medical and Legath as to the Eighth Amendment claim: the matter should proceed to trial as a deliberate indifference claim against defendants Easton and Sowers, and as a negligence claim against defendants Sowers, Legath, and PrimeCare Medical.

Report

I

James Margo was committed to prison on June 27, 2002. At that time, the Warden of the Bedford County Prison was Gordon Diehl; Eric Easton was the deputy warden. Pursuant to a 1997 contract between Bedford County and PrimeCare Medical, docket no. 87-22, medical care at the prison was handled by PrimeCare. PrimeCare's staffing procedure was to have a physician, William Fink, M.D. (who practiced in Johnstown, approximately one hour's drive away), under contract to provide services that required a licensed physician, while overall supervision of medical care at the prison by PrimeCare was handled by its employee, Physician

2

Assistant Francis Legath. Legath was also responsible for PrimeCare's provision of services at other sites, including the Cambria County Prison, and PrimeCare's policy called for Legath to be at the Bedford County Prison for sick call for four hours one day per week. Everyday supervision of medical care[2] was provided by PrimeCare's contract administrator, Connie Sowers, R.N., and Nurses M. Brallier and Judy Treese.

At Margo's initial screening, in a cell used for that purpose, Brallier interviewed Margo and Margo reported that he was a heroin user, that he used 5 bags (not further defined) of heroin per day, and that he had used heroin that day. Margo reported that he had medical conditions including seizures, blackouts, fall, and chest pain, and Brallier noted that Margo had needle tracks on both arms and was shaking during the screening process. Brallier took Margo's temperature (98.8), pulse (88), and blood pressure (122/62), and noted that Margo asked for medication "to bring him down." docket no. 73-4 at 4.

Margo was not moved out into the general population; he remained in the holding cell. On June 28, 2002, Margo complained to Treese about muscle spasms, nausea, and vomiting. Treese took temperature (99.8), pulse (120), and blood pressure (110/80), noted

---

2. The prison was a prison, not a hospital, so "everyday medical care" did not mean that there was 24 hour coverage by medical personnel or that ordinarily there was automatic interaction between inmates and medical staff after intake screening.

that Margo was curled up on his cot and shaking, and contacted Legath by phone. Legath ordered two medications for Margo: Tigan, to be given intramuscularly or by suppository twice a day for three days, and Catapres, to be given as needed twice a day for three days. Although PrimeCare's policy was for Legath to be at the prison once a week, and at this point it appears to have been the schedule for Legath to be at the Bedford County Prison on Mondays, Legath did not see Margo on Monday, June 28, 2002.

On June 29, 2002, Brallier reported that Margo had nausea and was vomiting. Margo received a dose of Tigan by suppository and a second one intramuscularly.

On the morning of June 30, 2002, Brallier reported that Margo was unable to keep down anything he ate or drank. She noted a blood pressure of 110/60 and administered Tigan intramuscularly. At 5:00p.m. that day she reported that Margo ate ice cream. Brallier gave Margo a second dose of Tigan at 8:00p.m, and noted Margo was trying to eat and drink.

The medical records indicate continued that Margo rested most of the day on July 1, 2002, with continued nausea and vomiting. There is no medical record for July 2, 2002. A postmortem Mortality Review, see docket no. 87-6 at 29, Legath depo. Exhibit B, prepared on July 10, 2002 indicates that Treese administered Tigan on July 2, 2002, and that Margo was resting most

of the day and still nauseated. It may be that the date of the Mortality Review is erroneous.

On July 3, 2002, Margo complained of nausea and of twice vomiting bile. Treese notified Legath, who issued an NPO (nothing by mouth, i.e. no food or water) order by phone to Treese. Legath testified that his order was "NPO 3-6," meaning three to six hours, but the order was logged as "NPO 36," presumably meaning 36 hours[3]. Treese testified that she believed she had mistakenly logged Legath's order. Treese depo. at 20-25. Treese's medication charting record, docket no. 87-18, indicates that whatever was said, the order was charted as 36 hours from 8:15p.m. on July 3, 2002, through July 5, 2002. The prescription of Tigan twice daily as needed was to be continued until Legath saw Margo, and Treese administered Tigan intramuscularly that evening. Treese noted that Margo appeared pale and weak and that his blood pressure was 98/70. Margo complained of a sore throat as a result of his vomiting.

The corrections staff at the Bedford County Prison maintain their own records, and note significant interactions with inmates. The log for July 3, 2002, indicates that Margo was

---

3. It is not clear whether either order was followed. Testimony from Easton, Easton depo. at 50. and Treese, Treese depo. at 26-27, indicated that corrections staff had experience with inmates in withdrawal before, that corrections staff kept Kool-Aid to offer inmates, and that Easton (according to Sowers, Sowers depo. at 56, 88) or someone else (according to Easton, Easton depo. at 34-36) offered Margo blue Kool-Aid to drink (which Margo accepted) during this time.

"unable" to walk and had to be assisted into the shower.   docket
no. 73-6 at 26, Easton depo., Exhibit 3.   While in the shower,
Margo reportedly had a "s[e]izure of some type."   These events were
apparently not reported to medical personnel.   See e.g. Treese
depo. at 35.

On July 4, 2002, the corrections staff log indicates that
Margo "couldn't" even sit up in a wheelchair to take a shower.
Easton depo., Exhibit 4.   Again, this was apparently not reported
to medical personnel: Sowers testified that Easton told her that
Margo had up and walking in his cell in the evening.   Sowers depo.
at 35-36, 40-41.

Sowers came to the prison on July 4, 2002.   She saw Margo
and asked him about indigestion and whether he took any medication
for it.   Margo replied that "I just take heroin." Sowers noted
Margo's temperature (98), pulse (100) and blood pressure (110/78)
and that Margo repeatedly stated "what?" in a weak voice.   Because
Margo's intake record did not show any complaint of hearing
problems, Sowers believed Margo was faking hearing problems and
that he was uncooperative with her attempts to monitor his medical
conditions.   Sowers depo. at 11.   The word she wrote in her notes
to describe Margo was "manipulative."   Legath testified that
"manipulative" is the word Sowers used in reporting Margo's
symptoms to him.   Sowers testified that she informed Legath of
Margo's vomiting and diarrhea on July 5, 2002, Sowers depo. at 72.

She noted one sign of dehydration but did not testify that she informed Legath of this or of a belief that Margo needed rehydration, Sowers depo. at 63, or hospitalization, id. at 72. She did schedule Margo for sick call on July 5, 2002.

At 4:00p.m. on July 5, 2002, Sowers reported that Margo was nonverbal and that he was incontinent, and was also spitting out food and refusing to walk. She noted that Margo pulled his legs up under him so that corrections staff couldn't place him on the medical scale to be weighed. Margo's temperature was 96.2, his pulse was 88, and his blood pressure was 90-58. Sowers spoke to Margo's wife, Deanna, who stated that Margo was "crazy", "lazy" and would do anything to get medication. (Deanna Margo denies ever saying any of this. D. Margo depo. at 88.) Sowers concluded Margo was attempting a hunger strike and spoke to Legath.

Legath had been at the prison on the morning of July 5, 2002, and Margo had been placed on the sick call schedule to see Legath. There is no dispute that Legath did not see Margo. According to the defendants' medical record, Margo refused to see Legath. Sowers depo. at 81, 89. Sowers and Deanna Margo testified that Legath stated that "he didn't make house calls," and that Margo could "crawl" to sick call if he wanted to be seen or "rot in his cell." Sowers depo. at 31-32; D. Margo depo. at 44. Legath denies these statements. Legath again prescribed Catapres and Tigan for Margo as needed twice a day for another three days, and

a diet of clear liquids for three days, then a soft diet for three days, and then a regular diet. Sowers wrote that Margo was to be offered powdered Carnation instant breakfast three times a day. She also called Bedford County MH/MR to request that a counselor see Margo. Sowers depo. at 19-20. Margo was moved to the larger medical isolation cell.

Brent Smith, a Bedford County MH/MR counselor, saw Margo at 4:30p.m. in the afternoon of July 5, 2002. He reported that Margo lay on the floor without speaking and was nearly "catatonic." Smith could not tell whether Margo was ill or deliberately refusing to communicate, but concluded that he could not properly interview Margo and that Margo would benefit more from drug treatment and detoxification.

Brallier spoke with Margo's wife at 5:00p.m. and reported his behavior. Brallier noted that Margo's wife reported that she and Margo had been using heroin since the previous September and that when Margo was in withdrawal he lay on the floor and acted "real lazy." See also Easton depo. Exhibit 5.

The prison's records indicate that at 6:05p.m., corrections officer Miller observed Margo sitting on the toilet in the isolation cell. Only minutes later, Miller called Brallier because Margo was observed lying on the floor. Margo had no pulse or respiration. Attempts to revive Margo were unsuccessful, as was

CPR. Margo was taken by ambulance to UPMC Bedford Hospital, where he was pronounced dead at approximately 6:50p.m.

The contract between PrimeCare and the Bedford County Prison called for medical personnel to have the final say in medical assignments, see docket no. 73-3 at 7, ¶9; see also docket no. 87-3 at 1, excerpt from Bedford County Jail Policies and Procedures Manual, but Sowers testified that in practice the corrections staff did not defer to medical decisions. Sowers in fact later in 2002 wrote a memo highly critical of the interaction between medical and corrections staff, including the criticism, based on her experience with Margo, that corrections officers refused to take medical advice when informed an inmate needed to be hospitalized. Sowers depo. at 52-53. Although she was not able to specify the date, Sowers depo. at 49-50, testified that she spoke to Easton about moving Margo to the hospital and that Easton's reply was to refuse, stating "[Margo] wasn't going anywhere." Sowers depo. at 18, 64-66, 71-72. She did not report this to Legath. Sowers depo. at 72. Because Sowers' notes indicate she was at the prison on July 4, 2002 and July 5, 2002, it may be she spoke with Easton on these dates. Easton denies Sowers' account, Easton depo. at 46, and states in an affidavit, docket no. 73, that he worked at the prison on July 2, 2002, and July 3, 2002, but was not even there on July 4, 2002, and July 5,

2002. The report of the Mortality Review Committee that met on July 10, 2002, records Easton as stating:

Eric Easton also stated that he met with the inmate daily and the day before his death he was verbalizing with inmate Margo. he stated that the inmate was not catatonic and he was not concerned that the inmate was in trouble or needed further medical attention. He stated inmate Margo was receiving pitchers of Blue Kool-Aid from Correctional Staff.

## II

The Federal Rules of Civil Procedure allow a party to obtain summary judgment upon a showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is "regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules... ." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Rule 56(c) requires the entry of summary judgment "... if ... there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "[T]he requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original). An issue of fact is "genuine" if the evidence is such that a reasonable factfinder might, under the applicable substantive law, return a verdict for the non-moving party. Id., 477 U.S. at 257. In determining whether there is an issue of material fact, all inferences must be drawn in favor of

the non-moving party. <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 322-23.

Prison inmates have a constitutional right that prison officials not be deliberately indifferent to their safety or to any other basic human need, including their serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976). There is no dispute in the present case that the complications of heroin withdrawal and the medical collapse Margo suffered are medically serious: the issue as to the individual defendants is whether, given the knowledge each defendant possessed at the time he or she made decisions affecting Margo's care, he or she acted with deliberate indifference. The Supreme Court has defined deliberate indifference for purposes of Eighth Amendment claims:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

<u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). Since a defendant's state of mind, like other facts, can be proved by circumstantial evidence, the <u>Farmer</u> standard does not require a defendant to admit his consciousness of the risk of serious harm before liability can be imposed. As the Court of Appeals stated, in<u>Woloszyn v. County of Lawrence</u>, 396 F.3d 314, 321 (3d Cir.2005)(citations omitted):

> Subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk.

11

Nevertheless, even gross errors of judgment are not constitutional violations[4]: liability requires subjective, not objective culpability. Farmer, 511 U.S. at 843 n.8.

Applying Farmer, Woloszyn affirmed the grant of summary judgment to corrections personnel at the Lawrence County Prison who allowed a pretrial detainee to commit suicide by hanging himself approximately ninety minutes after arriving at the prison. According to the appellate court, the lack of evidence that Woloszyn was a particular risk for suicide meant that defendants could not have been on notice that Woloszyn faced a substantial risk of serious harm. A fortiori, the individual defendants could not be deliberately indifferent to that risk.

By contrast, Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir.1997), reversed the grant of summary judgment for defendants in the case of an inmate assaulted by fellow prisoners. Hamilton, who had a long history of being assaulted by fellow prisoners

---

4. See Farmer, 511 U.S. at 844: [I]t remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. (my emphasis).

because he was perceived as an informant, was attacked at a Delaware prison while in the general population, two months after the multidisciplinary team (MDT) recommended he be placed in protective custody. The district court granted summary judgment on Hamilton's failure to protect claim; the court of appeals reversed.

Defendant Lewis, the head of the classification committee (CICC) which was a level above the MDT, denied the request for protective custody, for the stated reason that "there was no evidence of a problem" in the prison. The appellate court found that the existence of a material fact on the issue of substantial risk of serious harm was demonstrated by the fact that the MDT had made a not "unwarranted or one-sided" recommendation for protective custody. 117 F.3d at 747. The panel concluded there was a material issue of fact as to defendant Lewis' deliberate indifference, because Lewis could be charged with the knowledge of Hamilton's long history of being at risk for assaults as a result of being branded a snitch, and nevertheless decided not to place him in protective custody. The panel characterized that as a "decision to consciously disregard that risk." 117 F.3d at 748.

The members of the MDT were granted summary judgment by the district court on the basis that they had made the recommendation of protective custody (which in hindsight was the proper decision) and could not, once that course of action was

rejected by the CICC, <u>sua sponte</u>, place Hamilton in protective custody. The circuit reversed on the grounds that the MDT could have taken some "additional steps," after its recommendation was rejected, such as placing Hamilton in administrative segregation, and that the MDT's failure to do so "could be viewed by a factfinder as the sort of deliberate indifference to inmate safety" that would allow the imposition of liability on the MDT members. 117 F.3d at 749.

In <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 123 (3d Cir.2001), the Court of Appeals analyzed the question of deliberate indifference in determining the liability of supervisory personnel for the misconduct of a corrections officer at a juvenile detention center in New Castle, Pennsylvania. Plaintiffs Tate and Beers-Capitol, two juvenile female inmates, proved at trial that they had been sexually exploited by Whetzel, a male corrections officer; they appealed the trial court's earlier grant of summary judgment to all the supervisory personnel at the juvenile detention center. The Court of Appeals affirmed the grant of summary judgment to almost all of the supervisory officials, holding that plaintiffs' evidence of the general risk of sexual assault was not sufficient circumstantial evidence to create a trial issue that prison officials must have known of the risk that Whetzel would assault Beers-Capitol, and holding that the subsequent accusation that Whetzel had molested Beers-Capitol (and other inmates) was

insufficient to put most of the supervisory defendants on notice that Whetzel posed a risk to Tate. Significantly, however, the Beers-Capitol panel reversed the grant of summary judgment to one supervisory defendant, Nora Burley, who allegedly admitted to Tate she "kind of knew" of Whetzel's pattern of improper sexual contact with inmates. 256 F.3d 141-42.

### III

Plaintiff asserts that Easton is liable for violating Margo's rights under the Eighth Amendment by being deliberately indifferent to Margo's serious medical needs. Plaintiff also asserts that because of Easton's role as deputy warden, Easton is a policy maker for Bedford County and that he and Bedford County are liable for the harm caused by Bedford County's deficient policies. However, the Court of Appeals has stated that ordinarily, in a prison with a functioning medical department:

[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir.2004). Easton did not establish medical policy at the prison: pursuant to the contract between Bedford County and PrimeCare, the county removed itself from the direct provision of medical care to Margo and other inmates. Easton was not responsible for the negotiation of the contract and was not responsible for the decisions of PrimeCare or

its employees. As for Bedford County, absent some reason on its part to know at the time it entered into the contract with PrimeCare of a substantial risk that PrimeCare had been in the past or obviously would be an inadequate provider of medical care to heroin addicts, see Beers-Capitol, 256 F.3d at 134-35[5] (the two ways of proving supervisory liability are to show awareness of a pattern of similar injuries or to show that the risk of harm is so great that failure to anticipate it and respond is unreasonable) Bedford County could not know or be deliberately indifferent to that risk.

---

5. According to then Chief Judge Becker:
Plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice. Beers-Capitol v. Whetzel, 256 F.3d at 134.
   The record does not show unreasonable risks or any awareness of unreasonable risks. The prison had housed inmates in withdrawal before Margo, and Bedford had no reason to believe its medical contractor was unable to deal with their medical issues: Margo's death was without precedent at the Bedford County Prison.
   A closer question of Bedford County's liability for its policies is presented by the evidence that there was no communication by corrections officers of their observations that Margo was unable to walk and had a "seizure of some kind" in the shower in the days before his death. A policy of logging such information without passing it on to medical personnel is probably negligent. However, since the evidence is that Margo was already being monitored by the medical personnel, a guard's failure to tell a nurse that Margo showed signs of medical distress, something the nurses could have been expected to observe already, cannot be characterized as deliberate indifference.

16

Easton can be liable for his own individual actions, however. The record, taken in a light most favorable to plaintiff, could be found to show that Easton, despite his affidavit claiming that he did not work on July 4, 2002, was at the prison "verbalizing with" Margo on July 4, 2002. A jury could credit Sowers' deposition testimony that she believed that Margo needed to be transferred at that time to a hospital for rehydration, but that Easton said that Margo "wasn't going anywhere." Because interference by a corrections official with a medical professional's decision to provide or prescribe a particular medical treatment is the classic example of deliberate indifference, Easton could be found to have been deliberately indifferent.

Of course, Sowers' deposition testimony would, if believed by a finder of fact, also support a finding of deliberate indifference on her part. In <u>Hamilton v. Leavy</u>, the appeals court reversed a grant of summary judgment to prison officials (the MDT) who had had their recommendation of protective custody overruled by superior officials (the CICC), suggesting that those officials nevertheless had a duty to take additional steps. Here, unlike the relationship between the MDT and CICC in <u>Hamilton v. Leavy</u>, Sowers was not even in Easton's chain of command. Yet, according to her testimony, she never attempted to bring Easton's obstruction to the attention of Legath, Fink, or any other person at PrimeCare.

Further, she testified that in an emergency she or anyone else could have called 911 directly. She did not do so because she did not believe there was an emergency, but she did apparently believe there was a basis for moving Margo to the hospital. A jury could take the evidence most favorably to the plaintiff to conclude that Sowers perceived and was deliberately indifferent to a serious threat to Margo's health.

Sowers' testimony, however, exculpates both Legath individually and PrimeCare as a policymaker. If the jury believes Sowers, she never passed along her concerns to Legath, and she disregarded her ability under PrimeCare and Bedford County's contract to disregard corrections staff's opposition in making medical decisions: if Sowers acted in disregard of the existing policy, the policy cannot be said to have caused Margo's injuries. If the jury does not believe Margo, there is still no evidence that (if Margo's symptoms clearly signaled his grave condition) Legath knew of all the symptoms that would even have permitted him to draw the conclusion that Margo needed more advanced care. A jury could conclude that Legath made the "let him rot" remark when told Margo refused to come to sick call, and could conclude that this showed insensitivity to a genuinely sick inmate. But callousness is not deliberate indifference: the most that a jury could conclude is that Legath was aware of the symptoms reported by Sowers, Treese, and Brallier, and failed to draw a conclusion that Margo was unable

18

to come to sick call because of the effects of his dehydration, or to investigate Margo's condition more aggressively. That would support a finding of negligence.

IV

Plaintiff's claims for punitive damages, both in the deliberate indifference counts and negligence counts should be dismissed. Defendant Bedford County is, like any municipal defendant, immune from punitive damages in civil rights claims. Plaintiff's ability to obtain punitive damages in the other deliberate indifference claims is foreclosed by the provision of the Prison Litigation Reform Act codified at 18 U.S.C.§ 3626(a)(1)(A), which prohibits the award, in any action with respect to prison condition, of any prospective relief which is not "necessary to correct a violation" of federal rights. "Prospective relief" is defined in 18 U.S.C.§ 3626(g)(7) to be **all** relief other than compensatory damages. Since by definition punitive damages are not compensatory damages nor damages which "correct a violation" of a plaintiff's rights, but rather are punishment for a defendant's wrongdoing, they should be unavailable. I am aware that <u>Woodward v. Correctional Medical Services of Illinois</u>, 368 F.3d 917 (7th Cir.2004), suggests that if a plaintiff proves deliberate indifference the plaintiff should be able to recover punitive damages because the standards are in essence the same, but I believe that court overlooked the effect of the PLRA and the more

persuasive line of cases represented by <u>Coleman v. Rahija</u>, 114 F.3d 778 (8th Cir.1997), which held that an award of punitive damages requires a higher showing than simple proof of deliberate indifference to serious medical needs.

Punitive damages are foreclosed in the negligence claims by the facts of this case. Pennsylvania law provides that in a limited range of cases, punitive damages will be available[6]. <u>See</u> <u>SHV Coal, Inc. v. Continental Grain Co.</u>, 587 A.2d 702 (Pa.1991); <u>Moran v. G. & W. H. Corson, Inc.</u>, 586 A.2d 416 (Pa.Super.1991), <u>alloc</u>. <u>denied</u>, 602 A.2d 860 (Pa.1992). As thePennsylvania Supreme Court stated in <u>Feld v. Merriam</u>, 485 A.2d 742, 747-48 (Pa. 1984), adopting the Restatement (2d) of Torts §908(b):

The state of mind of the [defendant] is vital. The act, or the failure to act, must be intentional, reckless or malicious.

<u>See</u> <u>also</u> <u>Martin v. Johns-Manville Corp.</u>, 494 A.2d 1088 (Pa.1985). An award of punitive damages may be made only in those instances in which the conduct involves "some element of outrage similar to that usually found in crime," <u>see</u> <u>Moran</u>, 586 A.2d 422-23, <u>quoting</u> Restatement (2d) of Torts §908, comment b; or in which the defendant knows "of facts which create a high degree of risk of

_____

6. Under Pennsylvania law there is no need for punitive damages to be limited, in the case of minimal actual damages to the plaintiff, to some multiple of compensatory damages for the harm caused. <u>Kirkbride v. Lisbon Contractors, Inc.</u>, 555 A.2d 800, 803 (Pa.1989). Conversely, the severity of the injury sustained by plaintiff does not in itself constitute evidence in favor of punitive damages.

physical harm to another, and deliberately ... [acts] in conscious disregard of, or indifference to that risk," <u>SHV Coal</u>, 587 A.2d at 704, <u>quoting</u> Restatement (2d) of Torts, §500(a), comment.

Punitive damages require proof of an objective component - the defendant's actions risked a high degree of harm to the plaintiff - and a subjective component - the defendant either with acted with intent to harm or reckless disregard of the risk of harm to the plaintiff. <u>Burke v. Maassen</u>, 904 F.2d 178, 182-83 (3d Cir.1990)(discussing Pennsylvania Superior Court cases since <u>Martin</u>). Although the terms used by Pennsylvania courts are similar to terms used in deliberate indifference claims, an award of punitive damages under Pennsylvania law requires a higher showing than proof of deliberate indifference. Here, taken most favorably to plaintiff, Sowers and Easton neither intended harm or consciously disregarded a high risk of harm to Margo: Easton at worst did not want the expense and inconvenience of transporting a prisoner he personally did not believe was in need of care to the hospital, and Sowers at worst backed down from her position and settled for putting Margo on the sick line for the next day. That does not meet the high standard for an award of punitive damages.

V

In sum, this is a classic case presenting a triable issue of negligence on the part of Sowers, Legath, and by <u>respondeat superior</u>, PrimeCare. Though the evidence is thin and

contradictory, a jury could also arguably find deliberate indifference on the part of Sowers or Easton, or both. All other claims should be dismissed.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have ten days to serve and file written objections to this Report and Recommendation.

DATE: _March 4, 2008_  　　　　　　  _Keith Pesto_

　　　　　　　　　　　　　　　　Keith A. Pesto,
　　　　　　　　　　　　　　　　United States Magistrate Judge

Notice by ECF to counsel of record